**In re Shannon E. BAKER, and Connie B. Baker, Debtors.**

**Bankruptcy No. 92–50010–SJ.**

United States Bankruptcy Court,
W.D. Missouri.

April 21, 1992.

Shannon E. Baker and Connie B. Baker, pro se.

Leslie K. Rosenfeld, Leon G. Kusnetzky, P.C., Kansas City, Mo., for St. Joseph Postal Employees' Credit Union.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Debtors in this case are seeking to avoid the St. Joseph Postal Employees' Credit Union's ("the Credit Union") lien under 11 U.S.C. § 522(f)(2)(B), claiming that the 1986 Chevrolet Astro Van is a tool of Debtors' trade, and that the Credit Union's lien has lost its purchase money security interest status. Trial was held on April 17, 1992, at which Debtors represented themselves, and the Credit Union was represented by Leslie K. Rosenfeld. For the reasons to be stated, I find in favor of Debtors.

On or about July 29, 1986, Debtors obtained a loan from the Credit Union for the purchase of a 1986 Chevrolet Astro Van ("the Van"). The amount loaned was $11,-878, payable over five years with an interest rate of 10%. The Credit Union was granted a valid security interest in such vehicle. On or about April 11, 1990, Debtors contacted the Credit Union and requested an advance of an additional $2,000, to be used to purchase a used Oldsmobile. Rather than having Debtors execute a separate note, the credit officer suggested that the original obligation, and the new one, be rolled into one note with one monthly payment. At that point, the 1986 note had been paid down to $3,928.34, so the total amount of the April 1990 note was $5,928.34. In the process, the interest rate charged Debtors was raised to 12%. This rewritten note was to be paid over a period of 36 months.

In October 1990, Debtors requested an additional advance, this time to begin a business in Jamesport, Missouri. Debtors were advanced $1,200, and once again that obligation, together with the balance of the April 1990 note, was rolled into a new note, this time with interest at a rate of 11.75%, payable over 48 months. The amount of such note was $6,380. The Credit Union took no additional collateral for either of the rewritten notes. It should be noted that at certain times since 1986, Debtors also had a separate line of credit obligation to the Credit Union.[1]

---

1. Since the first refinancing in April 1990, Debtors have paid the Credit Union a total of approximately $2,359.39 on the various obligations. The Credit Union chose to apply certain of such payments to the notes secured by the Van, while others were applied to the line of credit. Mr. Baker testified that on more than one occasion

On or about January 3, 1992, the Van was repossessed by the Credit Union for payment defaults. In response, Debtors filed a Chapter 7 petition on January 8, 1992. The bankruptcy schedules filed with the petition show an obligation of $6,380.06 to the Credit Union, secured by the Van, with a value of $2,000–$2,800. On February 6, 1992, Debtors filed an amendment to their schedules claiming the van as an exempt tool of trade, pursuant to Mo.Rev. Stat. § 513.430(4) (1986). Apparently, since the filing of the case, they had received legal advice concerning their exemption rights. On February 7, 1992, Debtors appeared at their section 341 Meeting of Creditors. The minute sheet of such meeting shows that the trustee approved the claimed exemptions, and that an attorney appeared on behalf of the Credit Union. In any event, no timely objection was filed to such claim of exemption, so the exemption claimed by Debtors in the Van is valid. *See* Fed.R.Bankr.P. 4003(b)).

On March 30, 1992, Debtors filed a pleading entitled "Debtor's Motion for Return of 1986 Chevrolet Astro Van". With the agreement of the Credit Union's counsel, such pleading is being treated as a motion to avoid lien under section 522(f) of the Bankruptcy Code. 11 U.S.C. § 522(f) [2]. In their motion, Debtors contend that the Van is a tool of Mr. Baker's trade, and that the lien held by the Credit Union is a nonpossessory, nonpurchase-money security interest. Each of these issues will be considered in turn.

### ISSUES AND DISCUSSION

I. Whether Debtors' Van is a tool of the trade for purposes of *section 522(f)(2)(B).*

■ Mr. Baker offered into evidence documentation sufficient to show that, at the time of its repossession, the Van was being used predominantly in his business of transporting passengers. For example, his 1991 tax return stated that 78% of the Van's use in that year was for business purposes. His detailed log shows that he started the business in June 1990, and began actually transporting passengers in September of that year. Primarily, the business consists of transporting nondriving members of the Amish community, who pay him whatever they considered appropriate for the services rendered. Mr. Baker has a chauffeur's license, which is all he states is required to conduct a business of this nature. The chauffeur business was conducted out of the Country Peddler, a store in Jamesport, Missouri operated by Mrs. Baker. The 1991 tax return shows total gross receipts of $26,248.90 at the Country Peddler, with a deduction of $8,455.98 for car and truck expenses based on 30,749 miles driven. The business had a net loss of $1,604.96 in that year.

The Eighth Circuit has not decided the precise issue whether an automobile may be classified as a tool of the trade for lien avoidance purposes under section 522(f)(2)(B). However, in *In re LaFond,* 791 F.2d 623, 627 (8th Cir.1986), the court addressed this issue with respect to farm equipment and concluded that for an item to be regarded as a tool of the trade of the debtor for section 522(f)(2)(B) lien avoidance purposes, the test to be applied is "the reasonable necessity of the item to debtor's trade or business." *See In re Graettinger,* 95 B.R. 632, 635 (Bankr.N.D.Iowa 1988) (debtor's pick-up truck found to be tool of trade, and bank's lien avoided pursuant to section 522(f)(2)(B)).

In *In re Seacord,* 7 B.R. 121 (Bankr. W.D.Mo.1980), the debtor was described as a "wagon jobber" who was engaged in the

---

he asked the Credit Union to apply such payments on the note secured by the Van.

**2.** Section 522(f) states in relevant part as follows:

Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled ... if such lien is ... .

(2) a nonpossessory, nonpurchase-money security interest if any

\*　\*　\*　\*　\*　\*

(B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor....

business of selling low cost, high volume automotive parts to service stations, automotive repair shops, and used car lot operators in the greater Kansas City metropolitan area. The debtor attempted to avoid one of the Bank's liens against a specially equipped 1977 Chevy van under section 522(f)(2)(B). The court held "that indispensability is not the test of a 'tool of the trade' exemption; but rather the test is the reasonable necessity of the item to the debtor's trade or business." *Id.* at 123. The court concluded that nothing in the Missouri "tool of the trade" exemption indicates that the exemption is to be restricted to simple hand tools, etc.; "especially since no dollar limitation was placed on this provision." *Id.* at 124. Thus, the debtor was allowed to use section 522(f)(2)(B) to avoid the bank's non-possessory, non-purchase money lien on the van.

Based on the cited cases, and based on the extensive use of the Van in Mr. Baker's business of transporting passengers, I find that the Van does constitute a tool of the trade.

II. Whether the Credit Union's lien in the Van has lost its original purchase money security interest status because the *original loan was subsequently rewritten.*

■ The next issue is whether the original loan retained its purchase money character through the two refinancings of such obligation. In each refinancing the Credit Union retained a lien in the Van only, but advanced additional funds to be used for other purposes.

In *In re Faughn*, 69 B.R. 18 (Bankr. E.D.Mo.1986), the debtor had made three separate purchases from Anderson's Home Furnishings ("Anderson's"). Each purchase was financed by Anderson's, and each transaction was evidenced by a properly filed financing statement. However, each successive financing arrangement

simply added the balance of the amount owed under the prior transactions to the new amount of financing. The debtor argued that the only collateral in which Anderson's held a purchase money security interest were those items purchased in connection with the last transaction. The court agreed with the debtor and followed *In re Matthews*, 724 F.2d 798 (9th Cir. 1984).[3]

*Boatmen's Bank of Cape Girardeau v. Evans*, 715 F.Supp. 942 (E.D.Mo.1988), involved a security interest priority dispute between two secured creditors, Boatmen's Bank and FmHA. Boatmen's had loaned the borrower enough money to pay off the purchase money security holder of certain collateral. Boatmen's contended that it was equitably subrogated to the rights of the PMSI holder, and therefore, was itself a PMSI holder with priority in the collateral. FmHA was the secured party to a security agreement that contained an after-acquired property clause, which covered the collateral in which Boatmen's staked its claim. In concluding that FmHA held the superior security interest in the subject collateral, the court stated "[i]f the debt secured by a PMSI is refinanced, the purchase money nature of security interest is destroyed." *Id.* at 944. According to the court, Boatmen's extension of credit, in effect, refinanced the obligation and thereby extinguished its purchase money nature.

The same is true here. While the original loan proceeds were used to purchase the Van, the proceeds of the second loan were used to both purchase another vehicle and to pay off the first loan. And the proceeds of the third loan were used to start a business and to pay off the second loan. Since the original obligation was refinanced, its purchase money nature was destroyed.

One commentator indicates that the burden is on the creditor to take steps to

---

**3.** The *Matthews* court stated:

The vast majority of courts that have considered the issue we face here have held that refinancing or consolidating loans by paying off the old loan and extending a new one

extinguishes the purchase money character of the original loan because the proceeds of the new loan are not used to acquire rights in the collateral....

*Matthews*, 724 F.2d at 800–01.

preserve the purchase money character of a loan which is refinanced:

> Where the entire loan is consolidated or rewritten, the problem is ... complex. In such case there is not merely a formal, but also a substantive change. The total indebtedness changes, the interest rate may change, and other terms of the contract may change. In such cases it may be appropriate to treat no part of the debt as a purchase money debt any longer. If, on the other hand, the new creditor is careful to take an assignment of the old debt (or if it is the same creditor, to have a careful proration clause) it may be appropriate to conclude that there is no novation, but merely a continuation of the purchase money status. In all cases it will be the creditor's burden to show what part of the consolidated debt is purchase money debt and what debt has been liquidated by an undifferentiated payment.

2 James J. White and Robert S. Summers, *Uniform Commercial Code* § 24–9, at 331–32 (3d ed. 1988).

The Credit Union relies on *In re Baugh*, 19 B.R. 227 (Bankr.W.D.Mo.1982), for the proposition that a loan retains its purchase money character through a refinancing. That case, which was decided earlier than those cited *supra*, explains that the purchase money character is retained upon refinancing, except to the extent that the debtor had paid down the original obligation, or otherwise had equity, at the time of the refinancing. The opinion does not state whether there was any substantive change in the loan terms as a result of the refinancing. Here, those changes are critical. With each refinancing the interest rate, term, and monthly payment were changed significantly. In addition, new advances were made for other purposes but secured by the same collateral for which the original purchase money loan was made. These factors make it appropriate to treat no part of the debt as purchase money.

### CONCLUSION

For the reasons stated, the lien claimed by the St. Joseph Postal Employees' Credit Union in the 1986 Chevrolet Astro Van will be avoided pursuant to 11 U.S.C. § 522(f)(2)(B), and the Credit Union will be directed to return the Van to Debtors. An Order consistent with this opinion will be issued this date.